SMITH, Justice,
for the Court:
¶ 1. In this child custody case, we consider this case which began in 1994. Using 1994 statutory law, we are asked to consider a case that involves the original jurisdiction of two courts, involves the constitutional rights of a mother whose parental rights have been effectively terminated,[1] and involves the rights of minor children — the paramount consideration in such a case. As explained below, we reverse the judgment of the Harrison County Family Court, which purportedly terminated the mother’s parental rights, and we remand this case for implementation of the reunification plan developed by the court-appointed expert.

PROCEDURAL BACKGROUND

¶ 2. On March 25, 1994, the Family Court Intake Unit filed a Neglect Petition in the Harrison County Family Court alleging that T.A.P. (aged 6 years at the time of filing), J.C.P. (aged 5 years at the time of filing), and B.A.P. (aged 3 years at the time of filing) — the children whose best interests are at issue in the instant case-were neglected by their parents— *1097 J.P., their mother, and C. P, their father. On March 28, 1994, Family Court Judge Michael H. Ward conducted a Shelter Hearing upon petition of the Family Court Intake Unit. Judge Ward ordered the children temporarily placed with the Harrison County Department of Human Services, Division of Family and Children’s Services, Office of Social Services [DHS] for appropriate placement. The family court also authorized the DHS to provide necessary medical and educational needs of the minor children as well as “make reasonable efforts toward reunification of the children with their family.”
¶ 3. On June 9,1994, J.P. pled no contest to allegations of abuse and/or neglect of her children. On December 19, 1994, a hearing was held. The family court found that DHS had made reasonable efforts to maintain the children in their own home, that the best interests of the children were for DHS to place them with a foster home, that DHS make reasonable efforts to reunify the family, and that, among other things, J.P. enter into a Service Agreement with DHS setting forth the requirements for her to regain custody of the children.
¶ 4. On June 5, 1995, the family court held a review hearing to determine whether J.P.’s children could be returned to her custody and ordered such things as that the children remain with DHS for appropriate placement, that DHS obtain a psychological evaluation of T.A.P., that J.P. attend individual counseling until successfully discharged therefrom, and that DHS initiate proceedings to terminate C.P.’s parental rights. The court further ordered that DHS obtain a home evaluation on the residence of J.P. from the appropriate agency in Gallipolis, Ohio, and that the DHS would be denied foster care reimbursement from the federal government because it failed to request a home study for a period of time of 100 days or more equated to a failure to make a reasonable effort toward reunification of the family.
¶ 5. On November 80, 1995, DHS filed a motion for review hearing to consider making permanent plans for the children. On January 29, 1996, such hearing occurred. The January 29 th Order, administratively amended on August 26, 1996, required DHS to maintain the children, directed DHS to cease providing services to J.P., and directed DHS to file appropriate proceedings to include J.P. as party defendant in the petition to terminate C.P.’s parental rights.
¶ 6. The Petition to Terminate Parental Rights was filed July 1, 1996, in the Harrison County Chancery Court. Citing the termination of parental rights statute, Miss.Code Ann. § 93-15-103, DHS alleged, among other things, abandonment and desertion of the children as well as failure to eliminate ongoing behavior preventive of placement of the children with the parents despite DHS’s diligence. DHS further alleged that, while the children spent 1 year under the care and custody of DHS and despite DHS’s diligent efforts to develop and implement a plan to return the children to J.P., J.P. failed to exercise reasonable available visitation and faded to implement the agreed upon plan so that DHS was unable to return the children to J.P. On September 6, 1996, the chancery court appointed Frank McCreary Guardian Ad Litem for the children. In the chancery court, on September 27, 1996, J.P. filed her Answer to Petition to Terminate Parental Rights and Cross-Motion for Custody. Therein, J.P. sought to be restored as custodial parent to her children.
¶ 7. On October 8, 1996, in family court, J.P. filed a Motion to Reconsider or, in the Alternative to Transfer Jurisdiction. J.P. requested the family court to reconsider its January 29, 1996, recommendation to terminate parental rights or, in the alternative, transfer the matter for any determination of custody to the Harrison County Chancery Court on the grounds of judicial economy that, should J.P.’s parental rights not be terminated, the chancery *1098 court could determine custody without transferring the matter back to the family court.
¶ 8. On October 11, 1996, in both the chancery court and the family court, DHS filed its Answer to Cross Motion for Custody and Motion for Transfer and for Other Relief. DHS argued that the issue of custody and/or visitation had been adjudicated by the family court and, therefore, were res judicata to J.P. as well as an issue for, in the interests of judicial economy, the family court. DHS further argued that judicial economy warranted consolidation of the cross-complaint and the termination because the family court both may hear termination cases and is the proper court for custody and/or visitation issues. DHS also argued: (1) that the court not reconsider its recommendation of filing the termination petition because such was not in the best interests of children, and (2) that transfer of such matter would require the chancery court’s relitigation of facts already considered by the family court.
¶ 9. On October 18, in both the family and chancery courts, J.P. filed her Answer to Answer to Cross-Motion for Custody and Motion for Transfer and for Other Relief. J.P. objected to DHS’s request to transfer jurisdiction of the termination petition back to family court. J.P. further objected to DHS’s statement that family court custody and/or visitation actions are res judicata as to such matters litigated in chancery court.
¶ 10. On November 4, 1996, the family court issued an opinion and order in which it stated that it had already rendered its decision regarding termination and that there was no “authority for this Court to transfer to Chancery Court jurisdiction of the issue concerning custody for any child over whom this Court had original jurisdiction. In the absence of such authority, the Court may not so act.” The court further stated that DHS’s argument that the case be transferred to family court was not properly before it. The court stated that it may not force another court to act, but that, if DHS dismissed its termination proceeding, it could file in the family court.
¶ 11. On November 18, 1996, the chancery court terminated C.P.’s parental rights for abandonment, among other reasons, and awarded DHS full care and custody of the children. Included in DHS’s authority to provide for the children was the ability to place the children for adoption if such were in the best interests of such children. On December 19, 1996, the chancery court ordered that it would try the termination of parental rights petition and that all issues of custody and/or visitation were reserved to the family court.
¶ 12. On January 8, 1997, the chancery court, per Judge Thomas Wright Teel, entered judgment, which it amended on February 3, 1997. The court’s amended judgment held that DHS had failed to meet its burden of proof to terminate J.P.’s parental rights. The court specifically cited DHS’s failure to timely note problematic behavior as well as its failure to timely notify J.P. of a definitive return plan or to give her adequate time to comply before seeking severance of a working arrangement. Nonetheless, the court pointed out J.P. missed visits, evidenced poor written communication with DHS, evidenced poor telephonic communication, owns no vehicle, and is on a “financial see-saw.” The court noted:
[Tjhat neither poverty nor lack of resources are grounds for termination; however, many of these matters reflect on parenting and on one’s priorities. On the other hand, her attending the parenting courses and current employment record and attempt to have an adequate home for the children is quite commendable. Certainly, she loves these children; certainly, they love her.
The court found that it had no jurisdiction over custodial issues and referred the matter to family court.
¶ 13. In the family court, on January 10, 1997, J.P. filed a motion to renew her request to transfer jurisdiction to the *1099 chancery court or, in the alternative, for a hearing to immediately award her visitation and custody. J.P. also sought a temporary order granting immediate unsupervised visitation. On January 15, 1997, the family court “overruled” the motion to transfer pointing out it was the only forum with jurisdiction, appointed D. Scott Gibson Guardian Ad Litem, and ordered the motion for custody and/or visitation be set for hearing at a time convenient to counsel. J.P. objected to Gibson’s appointment, and, because of such objection, Gibson requested that he be replaced. DHS then filed a response in which it reaffirmed that the family court maintained original and exclusive jurisdiction, objected to transferring custody or unsupervised visitation rights to J.P., and voiced no objection to Gibson’s appointment. On February 10, the family court appointed McCreary Guardian Ad Litem.
¶ 14. On' February 19, 1997, the family court appointed Dr. William Gasparrini to complete a psychological evaluation and mental health examination upon the children and J.P. The court further adjudged that the cause be set for trial on March 19, 1997. On March 7, 1997, DHS moved that it retain legal custody, that physical custody remain with the foster parents and that it intended to, upon receipt of Dr. Gaspar-rini’s evaluations, prepare a structured service agreement to enter with J.P.
¶ 15. A family court hearing began March 19, 1997, and was continued until April 8, 1997. On April 9, 1997, the hearing resumed, then was continued until May 5, 1997. On May 5, the court took the cause under advisement, requested the Guardian Ad Litem provide the court with a written report, and took J.P.’s request for visitation under advisement. During the May 5 hearing, Dr. Gasparrini testified as to his evaluations that the case be closed within six months. Dr. Gasparrini further testified that if J.P. regularly paid child support, visited the children weeMy, and did not miss any of her psychotherapy appointments, she could be reunited with her children after -6 months. Guardian Ad Litem Frank McCreary submitted his report on May 21, 1996, in which he recommended resolution of the case so that the children may have stability.
¶ 16. On July 8, 1997, the family court ruled in the case. The court ordered that the children remain under DHS’s custody in the foster home. Visitation was not allowed, and the court found that DHS was not required to work with the mother nor to provide her any services. Indeed, the court stated:
The Court continues the custody of these children with DHS. It requires, however, that DHS maintain these children in the home of the [foster parents], the only family these children now have. Because the Court finds that the last time the children saw their mother it was extremely detrimental to them, the Court orders no visitation for the mother. Because the Court finds that the best interest of these children lie in being placed outside the home and because the Court finds that it would be detrimental to the children to visit their mother (a situation unlikely to change within a reasonable period of time) and because of the tremendous caseload of DHS, this Court finds that DHS is not required to work with the mother nor to provide any services to her.
On July 10, 1997, J.P. filed her Motion for Reconsideration of the July 3, 1997, order.
¶ 17. In family and chancery court on July 23, 1997, J.P. filed similar though not identical motions, which the chancery court granted September 19, 1997, to proceed in forma pauperis with her appeal of the family court’s denial of custody or visitation.
¶ 18. On August 27, 1997, a family court hearing was held at which the court issued an order it was taking the cause under advisement for ruling at a later date. DHS’s Complaint for Support and Other Relief was filed September 26, 1997. Therein, DHS sought, among other things, *1100 a reasonable sum for ongoing support of the children and, if it is available at reasonable cost, health insurance. On January 16, 1998, the family court denied both the motion for reconsideration and the motion for leave to appeal in forma pauperis. On January 23, 1998, J.P. filed a Notice of Appeal of the family court judgment of July 3, 1997, and the January 16, 1998, order overruling Appellant’s Motion to Reconsider.
¶ 19. On January 26, 1998, the family court set aside its January 16, 1998, order as erroneous and replaced it with a new Opinion and Order. Citing M.L.B. v. S.L.J., 519 U.S. 102, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996), the court ordered that J.P. be allowed to appeal the cause in forma pauperis and be furnished the transcript of the review hearing. The court further ordered that the motion to reconsider the July 3, 1997, order of the court was denied. The following statement of the court is particularly relevant for the appeal:
Even though the Chancery Court has declined to terminate J.P.’s parental rights, this court has found that the best interests of the children, the polestar consideration in every child custody case, whether the case be in Chancery or Youth Court, lie in the children having no contact with J.P. As such, her parental rights are effectively terminated.
The Chancellor has determined that the case for terminating J.P.’s parental rights is insufficient as a matter of law. This Court has determined that to see their mother would be detrimental to the best interests of the children, effectively terminating JJP.’s parental rights.
On February 3, 1998, J.P. filed in family court a Notice of Appeal from the July 3, 1997, judgment and from the January 26, 1998, order overruling the Motion to Reconsider.

THE FACTS

¶ 20. In December of 1993, J.P. requested the Harrison County DHS office’s assistance in obtaining housing. She had sought housing, but was unsuccessful. J.P.’s ex-husband, C.P., helped care for the children until his arrest for the rape of a 13 year-old girl. C.P.’s cessation of paying child support caused J.P. to lose the apartment in which she and the children had been residing. For a month or two, J.P. and the children actually lived out of her car.
¶ 21. In March of 1994, J. P., pursuant to DHS’s advice, placed the ‘ children in a shelter. J.C.P. and B.A.P. were originally placed in separate foster homes. B.A.P. later joined J.C.P. in the same foster home. T.A.P. joined the other children at the same foster home in August of 1995 after spending time in the Pine Grove, then Laurelwood, and, finally, Crossroads treatment facilities. In fact, T.A.P. was in therapy at the Gulf Coast Mental Health Center prior to the family’s December 1993 visit to DHS.
¶22. J.P. maintained telephone contact with T.A.P. while T.A.P. was at Crossroads. She visited the other two children several times in 1994, but also canceled a visit scheduled for October 13, 1994. J.P. entered a service agreement with DHS on November 23, 1994." The service agreement or case plan required J.P. to obtain adequate housing in 3 months, apply for jobs within 6 weeks, and enroll in and pass parenting classes.
¶ 23. J.P. visited the children on 6/7/94, 7/7/94, 9/14/94, 11/23/94, and 5/17/95. J.P. lived with a friend for a time, then moved to Ohio on approximately November 25, 1994. While in Ohio, J.P. had housing, attended a jobs program, completed parenting classes, and underwent an Intake/Diagnostic Assessment at Woodland Centers, Inc., in Gallapolis, Ohio.
¶ 24. In Spring of 1995, J.P. returned to Mississippi, moved in with a friend, and learned from the friend how to hang wall *1101 paper. She serves as a wallpaper hanger subcontractor for her friend and earned approximately $16,000.00 gross income in 1996. In June of 1995, DHS denied J. P.’s request to attend her children’s ball games. In fall of 1995, J.P. felt one of the DHS caseworkers was hindering her case, so she called Attorney General Moore’s office, and the caseworker’s supervisor in hope of effecting a change in caseworkers.
¶ 25. J.P. owns her own mobile home, is capable of clearing $300.00 per week, and should be able to work in Harrison County all of the time. She also has access to her friend’s vehicles for necessary trips. J.P.’s therapist, Dr. Fox, believes that her key problem is that she is separated from her children. Dr. Fox recommends reunification.
¶ 26. The children reside in the same foster home where they have pets, play, attend school, and have a stable home. Dr. Gasparrini diagnosed each of the children as having an adjustment disorder while he further diagnosed T.A.P. with Attention Deficit Hyperactivity Disorder. Dr. Gasparrini recommended reunification of the children with J.P. in six months if J.P. paid child support, regularly visited her children, and continued on a regular basis her out-patient psychotherapy without missing appointments.

LEGAL ANALYSIS

WHETHER THE FAMILY COURT, SUBSEQUENT TO AN ADJUDICATION OF NEGLECT, CAN REFUSE VISITATION RIGHTS TO A NATURAL PARENT AND ORDER THE DEPARTMENT OF HUMAN SERVICES TO CEASE WORKING WITH THE PARENT THEREBY EFFECTIVELY TERMINATING PARENTAL RIGHTS WHEN THE CHANCERY COURT HAS DENIED THE STATE’S PETITION FOR TERMINATION OF PARENTAL RIGHTS.
¶27. Appellant J.P. argues that “[tjermination, regardless of what it is called, is termination.” J.P. argues that cessation of DHS services coupled with denial of visitation equates to termination of parental rights. J.P. further points out that the family court’s actions were not conducted according to the governing statutes and the proof failed to meet the clear and convincing proof standard.
¶ 28. Appellee DHS argues that “[tjhere was sufficient evidence presented to allow the Family Court Judge to exercise his lawful authority to terminate reunification efforts by MDHS and visitation as concerns Mrs. P.... ” DHS further states that, pursuant to Miss.Code Ann. § 43-21-613 (1993), J.P. retains the option to seek, herself or through the Guardian Ad Litem, modification of the family court’s order, which, DHS believes, is not an order terminating parental rights.
¶ 29. Guardian Ad Litem Frank McCreary argues that the family court properly exercised its exclusive jurisdiction over custody and visitation issues. McCreary further states that the family court’s order was not terminative, was a lawful exercise of the court’s power, was in the children’s best interests, and should be affirmed.
¶ 30. In Albright v. Albright, 437 So.2d 1003 (Miss.1983), this Court reiterated the rule that the polestar concern is that of the best interests and welfare of the child. See id. at 1005; see also In the Interest of R.D. (Linda D.), 658 So.2d 1378, 1386 (Miss.1995). The Albright Court further stated that the age of the child is one factor to be considered equally with other factors such as health, emotional ties between the child and the parent, employment of the parent, and the parent’s willingness and capacity to provide primary child care. See Albright, 437 So.2d at 1005. Further, “[i]n custody battles involving a natural parent and a third party, it is presumed that a child’s best interest will be served by placement in the custody of his or her natural parent, as against any third party.” See Sellers v. Sellers, 638 So.2d 481, 484 (Miss.1994). *1102 Also, “the focus [on the child’s best interests] does not change in custody matters where it is not one parent vying against the other for custody of their child, but rather, DHS seeking to retain custody of a neglected or abused child rather than have him returned to a parent.” In the Interest of R.D. (Linda D.), 658 So.2d at 1387.
¶ 31. In a case involving an indigent mother who sought in forma pauperis grant of the trial transcript so she could appeal the termination of her parental rights, the United States Supreme Court stated that such a “case, involving the State’s authority to sever permanently a parent-child bond, demands the close consideration the Court has long required when a family association so undeniably important is at stake.” See M.L.B., 519 U.S. at 116-17, 117 S.Ct. 555 (footnote omitted). Indeed, “[c]hoiees about marriage, family life, and the upbringing of children are among associational rights this Court has ranked as ‘of basic importance in our society,’ rights sheltered by the Fourteenth Amendment against the State’s unwarranted usurpation, disregard, or disrespect.” See id. at 116, 117 S.Ct. 555 (citations omitted).
¶ 32. As in M.L.B., the stakes for J. P., i.e., “forced dissolution of her parental rights,” are “more substantial than mere loss of money.” See id. at 121, 117 S.Ct. 555 (citations omitted). Further, “[f]ew forms of state action ... are both so severe and so irreversible.” See id. at 118, 117 S.Ct. 555 (citations omitted). “In contrast to loss of custody, which does not sever the parent-child bond, parental status termination is ‘irretrievably] destructive]’ of the most fundamental family relationship. And the risk of error, Mississippi’s experience shows, is considerable.” See id. at 121, 117 S.Ct. 555 (citations omitted).
¶ 33. As previously stated, we are governed by 1994 law and must acknowledge that two courts-chancery and family-maintained original jurisdiction in this case. Original and exclusive jurisdiction in child neglect cases is granted to the family court under Miss.Code Ann. § 43-23-5 (1993). See also Miss.Code Ann. § 43-21-151(1) (1993) (speaks of the youth court’s jurisdiction; reading § 43-21-151(1) with § 43-23-5, the family court has the same jurisdiction as the youth court). Miss.Code Ann. § 43-21-103 (1993) provides regarding the youth court:
This chapter shall be liberally construed to the end that each child coming within the jurisdiction of the youth court shall become a responsible, accountable and productive citizen, and that each such child shall receive such care, guidance and control, preferably in such child’s own home as is conducive toward that end and is in the state’s and the child’s best interest. It is the public policy of this state that the parents of each child shall be primarily responsible for the care, support, education and welfare of such children; however, when it is necessary that a child be removed from the control of such child’s parents, the youth court shall secure proper care for such child.

See id.

¶ 34. Miss.Code Ann. § 43-21-603 (1993), in pertinent part, governs the proceedings. If a child is regarded as neglected, the youth court should consider factors such as the child’s physical and mental conditions, the child’s need of assistance, the manner in which the parent, guardian or custodian participated in, tolerated or condoned the neglect, and the ability of a child’s parent, guardian or custodian to provide proper supervision and care of a child. See id. Miss.Code Ann. § 43-21-609 (1993) further provides alternatives the court may employ in disposing of neglect cases. See id. Of the alternatives, custody to the parents precedes assistance by child-care agencies. See id.
¶ 35. The family court’s jurisdiction is despite the Mississippi Constitution, which states in Section 159 of Article 6 that the chancery court “shall have full jurisdiction *1103 in ... [mjinor’s business.... ” See id. Yet, Section 172 of Article 6 of the Mississippi Constitution states that “[t]he legislature shall, from time to time, establish such other inferior courts as may be necessary, and abolish the same whenever deemed expedient.” See id. In light of such, this court has held constitutional the youth court and its jurisdiction. See In the Interest of D.K.L., 652 So.2d 184, 189 (Miss.1995); DeLee v. Wilkinson County (In the Interest of D.L.D.), 606 So.2d 1125, 1127 (Miss.1992); Cortesi v. Washington County DHS (In the Interest of T.L.C.), 566 So.2d 691, 696-97 (Miss.1990).
¶ 36. Key to this termination case is the 1994 statutory language of Miss. Code Ann. § 93-15-105 (1994), which limits the filing of petitions for termination of parental rights to chancery court. See id. Section 93-15-109 requires ■ that before the chancellor may terminate parental rights the chancellor must be satisfied by clear and convincing proof that the grounds provided in § 93-15-103(3) are met. The clear and convincing proof standard was mandated by the United States Supreme Court in Santosky v. Kramer, 455 U.S. 745, 769-70, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). Indeed, in a case where the family court ordered termination proceedings be instituted in the chancery court, this Court stated:
We hold that there was no error in the trial below and in the order of the Family Court of Harrison County. The institution of proceedings to terminate parental rights would necessarily have to be initiated in the proper chancery court where appellants here would have a full opportunity to appear and defend the action and the right to be represented by competent counsel. The burden of proof in such a proceeding rests upon the agency seeking to terminate parental rights, and the evidence must be clear and convincing.
In the Interest of T.T., 427 So.2d 1382, 1384 (Miss.1983) (citation omitted).
¶ 37. In determining whether the family court properly acted, we must apply the proper standard of review. In Collins v. Lowndes County Pub. Welfare Dep’t, 555 So.2d 71, 72 (Miss.1989), we stated that:
[w]hen a Youth Court makes an adjudication of neglect, this Court considers all the evidence before the Youth Court in the light most favorable to the State. If the evidence so considered is opposed to the finding of the Youth Court with such force that “reasonable men” could not have found as the Youth Court did by a preponderance of the evidence, this Court must reverse.
See id. at 72 (citation omitted). Further, when visitation questions are at bar, “ ‘[a]ll that need be shown is that there is a prior decree providing for reasonable visitation rights which isn’t working and that it is in the best interest of the children as fostering a positive and harmonious relationship between them and their ... parents [or DHS] to have custody provisions made specific....’” See Clark v. Myrick, 523 So.2d 79, 83 (Miss.1988) (quoting Cox v. Moulds, 490 So.2d 866, 869 (Miss.1986)). As we explained in a case heard in chancery court, evidence must be presented that the restriction is necessary to protect the children from harm before the restriction may be imposed; otherwise, imposition of such restriction is abuse of discretion. See Harrington v. Harrington, 648 So.2d 543, 545 (Miss.1994).
¶ 38. While the family court has exclusive original jurisdiction over neglect matters, this case involved two separate questions — (1) custody and visitation, and (2) termination. A termination decision differs from one dealing with custody and visitation. This case began in family court. The chancery court heard the case on termination as was its exclusive right under § 93-15-105, per the statute’s 1994 language. Hence, the family court’s decision, admittedly “ ‘effectively terminating’ J.P.’s parental rights,” was beyond its power. Indeed, this Court has stated that *1104 “[w]hen a decree terminating parental rights is entered, it either terminates the parental rights or it does not.” Millien v. State, 408 So.2d 71, 74 (Miss.1981).
¶ 39. The facts of Millien are enlightening to the facts here. In Millien, there was an ambiguous decree terminating the mother’s parental rights “and then provided for visitation rights with the children.” Id. There, this Court stated that such a decree does neither when it claims to terminate and yet grants visitation rights. This Court held there that such a decree has no force and effect and is set aside. Id. Here, we have an equally vague and ambiguous order which must be set aside as null and void, thereby leaving the chancellor’s decree in effect.
¶ 40. The Family Court Judge appeared to be frustrated with J.P.’s failure of total commitment to her children to the extent that the judge believed she was not acting in the children’s best interests. There is also convincing evidence that the judge was also frustrated about DHS’s ineffective performance in handling this case. Although the Family Court Judge states in his order, dated January 26, 1998, that he, in effect, has terminated J.P.’s parental rights, there is nothing in the order that declares that her parental rights were in fact terminated. The order “either terminates the parental rights or it does not.” Millien at 74. There was no petition to terminate parental rights before the Family Court Judge. In fact, the Family Court initially recommended termination proceedings in the Chancery Court. Subsequently, the Family Court noted that the Chancery Court had. denied DHS’s attempt (at the direct order of the family court) to terminate her parental rights based on DHS’s failure to carry its burden of proof. In response to the chancellor’s denial, the family court subsequently claimed to “effectively” terminate her rights by denying custody and visitation and that is all the judge did, i.e. deny custody and visitation.
¶41. However, the termination of child custody and visitation rights does not, in and of itself, terminate parental rights. See Humphrey v. Pannell, 710 So.2d 392, 402 (Miss.1998)(Banks, J., concurring in part and dissenting in part) (granting custody to one parent is not tantamount to termination of parental rights). The controlling statute contemplates that parental rights involve more than custody and visitation, as follows:
After hearing all the evidence in regard to such petition, if the chancellor, family court judge or county court judge is satisfied by clear and convincing proof that the parent or parents are within the grounds requiring termination of parental rights as set forth in this chapter, then the court may terminate all the parental rights of the parent or parents regarding the child, and terminate the right of the child to inherit from such parent or parents. The termination of the parental rights of one (1) parent may be made without affecting the parental rights of the other parent, should circumstances and evidence ever so warrant.
Miss.Code Ann. § 93-15-109 (Supp.1998). Parental rights therefore involve more than simply visitation and custody.
¶ 42. In this case, J.P. was required to meet three criteria-pay child support regularly for six months, visit the children weekly for six months, and continue outpatient psychotherapy — set out by a court-appointed psychologist in order to keep her parental rights. The record indicates that J.P. substantially met those three criteria. However, in In Interest of R.D. (Linda D.), we held that compliance with a “service agreement, in and of itself, is insufficient to warrant a finding that her children should be returned. It is simply one element of proof to be considered.” 658 So.2d 1378, 1389 (Miss.1995). The polestar consideration in custody matters is the best interest of the children. Mercier v. Mercier, 717 So.2d 304, 306 (Miss.1998). Thus, J.P.’s compliance with “all *1105 that was required of her” is only one element of proof to be considered in determining the best interests of the children. The family court was therefore correct in following the procedures set out in In Interest of R.D. (Linda D.)
¶ 43. However, in viewing the entire record, it is unmistakable that DHS did a poor job of presenting its case to the chancery court, and it is no wonder that the chancellor denied the Termination of Parental Rights (TPR). While J.P. may not have performed admirably toward her children on all occasions, nevertheless, this record before us does not support the family court’s decision to “effectively terminate” her rights by denying her custody and visitation. The family court cites an incident that occurred at the foster care review board hearing in the summer of 1996 where the children allegedly “regressed.” However, DHS employee Beth Ramsey testified before the family court that “[i]t was a very upsetting meeting.” She further testified that the children cried, clung to their mother, and wanted to go home with her. Finally, she stated that such is “usually the case.” In other words, such is normal behavior for children in these circumstances and hardly implies “regression” sufficient to justify denial of custody and visitation.
¶ 44. Not only was J.P. denied visitation and custody, but the family court’s July 3, 1997, order also denied J.P. the right to work with DHS “or to provide any services to her ...” because of DHS’s “tremendous caseload.” This is clear error based upon the facts presented here. Based upon the record which supports the chancellor’s denial of the TPR presented by DHS, J.P. is still the children’s mother by law. DHS services should be continued to J.P. She may still be able to show a material change in circumstances at a later date and attempt to regain custody or at least visitation. Regardless of its workload, DHS should be required to provide services to her as the mother of the three children. Finally, it is the obligation of the court to act in the best interests of the children, and denying DHS services to their mother without a termination of parental rights is an abuse of discretion.
¶ 45. The family court’s judgment is reversed and the case remanded for proceedings consistent with this opinion, such that the rights of J.P. to receive DHS services and possibly visit her children are reinstated and a chance for reunification available as per the order of the chancery court. Hence, the family court judge, consistent with the guide of this opinion, shall follow the court expert’s plan for reunification. That plan should at a minimum be given an chance to succeed. The best interests of the children demand it.

CONCLUSION

¶ 46. J.P. should be granted an opportunity to be reunified with her children in light of the plan created by the psychologist appointed by the family court. Regardless of the financial disparity between the mother and the foster parents, the mother loves her children and should be allowed to prove she will do what is necessary to care for them. Hence, the judgment of the Harrison County Family Court is reversed, and this ease is remanded for action consistent with this opinion.[2]
¶ 47. REVERSED AND REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION.
*1106 PRATHER, C.J., SULLIVAN AND PITTMAN, P.JJ., BANKS, MILLS, WALLER AND COBB, JJ., CONCUR.
McRAE, J., NOT PARTICIPATING.

. We do not consider the previously terminated parental rights of the father, C.P. He is a convicted felon who raped a 13-year old girl.

. We note that 1999 legislation abolishing the Family Court, 1999 Miss. Laws Ch. 432, has recently become effective on May 28, 1999, when the U.S. Attorney General precleared it under Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973c. Section 1 of this new legislation directs, in pertinent part: "all matters pending in any family court abolished shall be transferred to the county court of the county wherein the family court was located without the necessity of any motion or order of court for such transfer.” Therefore, the proceedings on remand in this case shall occur in the Youth Court which is now the responsibility of the County Court of Harrison County.